UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

JORDAN STRAH,                                      :    Case No. 26-3428
                                                   :
                          Plaintiff,               :    **COMPLAINT WITH**
                                                   :    **JURY DEMAND**
           -against-                               :
                                                   :
FRANKLIN RESOURCES, INC., K2 ADVISORS,             :
LLC, and K2/D&S MANAGEMENT CO., LLC,               :
                                                   :
                          Defendants.              :

---------------------------------------------------------------- X

Plaintiff Jordan Strah alleges against Defendants Franklin Resources, Inc., K2 Advisors, LLC, and K2/D&S Management Co., LLC (collectively, "Franklin Templeton"):

**PRELIMINARY STATEMENT**

1.     During his employment with Franklin Templeton, Strah complained about serious egregious trading fraud committed by his then manager, Michael Rich. Lilly Knight, now a portfolio manager for Franklin Templeton Investment Solutions and previously a managing director for "K2 Advisors," where Rich worked along her side, told Strah that Franklin Templeton would not terminate Rich's employment and instead asked Strah to resign.

2.     Strah refused to resign and continued his pursuit of stopping Rich from deceiving Franklin Templeton's investors.

3.     Finally, after too long a period, Franklin Templeton terminated Rich's employment.

4.     But Franklin Templeton wanted Strah out of Franklin Templeton and after a series of retaliatory actions, Franklin Templeton's unlawful retaliation against Strah culminated in terminating his employment on March 25, 2025, for the purported pretextual reason of a reduction in force. But this flies in the face of reason as Strah was the only person at Franklin Templeton who had been managing the Franklin K2 Cat Bond UCITS Fund. Strah was the only person with

industry knowledge, systems access, and processes for running the fund, leaving only Rob Christian, Lilly Knight, and Vaneet Chadha to manage the fund and they were all woefully unqualified to do so.

5.    Franklin Templeton's conduct violated the Sarbanes-Oxley Act of 2002 ("SOX"), 18 U.S.C. 1514A, and the New York Labor Law § 740.

## JURISDICTION AND VENUE

6.    This Court has jurisdiction under 28 U.S.C. § 1331 as this action involves a federal question under SOX.

7.    Venue is proper in the Southern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Strah's claims occurred in this judicial district, including Strah's employment and performance.

## ADMINISTRATIVE PREREQUISITES

8.    On April 2, 2025, Strah filed a complaint with the Occupational Safety and Health Administration ("OSHA") alleging that Franklin Templeton violated SOX.

9.    More than 180 days have passed since Strah filed his complaint, and no final decision has been issued with respect to the allegations in his complaint.

10.    Accordingly, Strah is entitled to seek de novo review of his allegations by this Court pursuant to 18 U.S.C. § 1514A(b)(1)(B).

11.    Any and all other prerequisites to the filing of this suit have been met.

**PARTIES**

12.     Plaintiff Strah was, at all relevant times, an "employee" under New York Labor Law § 740 and 18 U.S.C. § 1514A(b)(1)(B). Plaintiff is domiciled in New York.

13.     Defendant Franklin Resources, Inc. is a Delaware corporation headquartered in San Mateo, California. It is "one of the world's largest investment managers," and "better known as Franklin Templeton." Through its "distinct specialist investment managers," it "offer[s] specialization on a global scale, bringing extensive capabilities in fixed income, equity, alternatives and multi-asset solutions." www.franklinresources.com. It is a public company, and a member of the S&P 500, traded on the NYSE as BEN.

14.     Defendant K2 Advisors, LLC is a Delaware limited liability company that was formed in 1997. It is an American fund of funds investment firm headquartered in Stamford, Connecticut. K2 Advisors, LLC has delegated a substantial part of its management activities to Defendant K2/D&S Management Co., LLC, an affiliate of K2 Advisors, LLC that is also a registered investment adviser pursuant to the Advisers Act.

15.     Defendant K2/D&S Management Co., LLC's Principal Office and Place of Business is 100 First Stamford Place, 5th Floor, Stamford, CT 06902. It also has an office at One Madison Ave, 2nd Floor, New York, NY  10010.

16.     K2 Advisors, LLC and K2/D&S Management Co. are collectively referred to as "K2 Advisors" or "K2".

17.     All Defendants are collectively referred to herein as "Franklin Templeton," and jointly were Strah's "employer" under 18 U.S.C. § 1514A(b)(1)(B) and New York Labor Law § 740.

3

18.    According to Franklin Templeton's Position Statement it filed with OSHA:

> K2 is an alternative investment firm headquartered in Stamford, Connecticut, which primarily serves institutional investors." Position Statement, p. 3. "Franklin Templeton acquired K2 in 2012, but its investment team continued to operate largely independently until 2024, when it was merged into Franklin Templeton Investment Solutions ("FTIS")[1] as part of a larger corporate reorganization effort. Once it became part of FTIS, K2 was rebranded as the Absolute Return Portfolio Management team." Id.

## **FACTUAL ALLEGATIONS**

**1.    Strah's Educational And Work Background Make Him Exceptionally Good At Uncovering The Fraud He Uncovered And Reported.**

19.    Strah is a seasoned investment manager. He graduated from Bowling Green State University in December 2014 with a B.A. in Economics.

20.    His first job after college commenced in February 2015 at Guardian Life where he focused on life insurance and annuities.

21.    After receiving his Series 7 and 63 licenses, in February 2017, Strah left Guardian Life to be even more focused on life insurance.

22.    In February 2017, Strah commenced employment with KeyBank / Key Private Bank ("Key"), focusing on life insurance policies. While at Key, Strah studied to get his Charter Alternative Investment Analyst ("CAIA") designation.

---

[1] Franklin Templeton Investment Solutions "is a global leader in multi-asset, quantitative, and hedged solutions, offering clients a single point of access to public and private market capabilities." www.franklintempleton.com/about-us/franklin-templeton-investment-solutions.

23.     In November 2017, Strah commenced employment with The Proper Analysis Corporation, a registered investment advisor ("RIA"). At The Proper Analysis Corporation, Strah worked on alternative assets, such as Insurance-Linked Securities and Private Equity. Additionally, he would integrate data into a portfolio management software program called Addepar. Addepar is a cloud-based wealth management software platform for RIAs that specializes in data aggregation, analytics, and portfolio reporting. It assists investment professionals globally by providing data, insights, and cutting-edge technology. The platform is designed for high-net-worth and ultra-high-net-worth individuals and companies.

24.     In November 2018, The Proper Analysis Corporation, named Strah Chief Compliance Officer. Thus, from a compliance standpoint, Strah should be valued for his expertise in the area.

25.     In June 2019, Strah left The Proper Analysis Corporation to move to New York City and start at Risk Management Solutions ("RMS"), which was acquired by Moody's Corp. in 2021.

26.     Strah began working at RMS as an Account Manager, Associate for the Capital Markets Team, prior to RMS promoting him to the Lead in North America. During his time at RMS, Strah worked on remodeling transactions, such as cat bonds,[2] contract modeling for private transactions, fielding incoming technical and product questions and installing the "Miu" system for clients. One of these clients was K2 Advisors LLC ("K2 Advisors"),[3] who would later become

---

[2]     A catastrophe bond (cat bond) is a way for insurance companies to transfer catastrophe risk to investors. The investor earns income for assuming the underlying risk(s) from the sponsor. If a covered natural catastrophe does occur, the investor can lose some or all of their principal investment, which goes toward covering the sponsor's losses.

[3]     "As of October 1, 2024, K2 Advisors is now known as Absolute Return Portfolio Management Team which joined Franklin Templeton Investment Solutions (FTIS) in early 2024."

Strah's employer and a reason for his hiring; as this is the third-party risk management software they use for cat bond strategies.

27.     In February 2021, Strah left RMS and joined New Paradigm Underwriters as a Risk and Modeling engineer, specializing in parametric structures covering windstorm and earthquake risks. This was Strah's last job before joining K2 Advisors, which joined Franklin Templeton Investment Solutions in early 2024.

### 2.     January 10, 2022 Was Strah's First Day At K2 Advisors, Which Joined Franklin Templeton Investment Solutions In Early 2024.

28.     January 10, 2022 was Strah's first day at K2 Advisors, which joined Franklin Templeton Investment Solutions in early 2024.

29.     Michael Rich had just become the Lead Portfolio Manager to the Cat Bond strategies, following Jonathan Malawer's departure. https://www.artemis.bm/news/k2-advisors-names-michael-rich-as-head-of-ils-to-succeed-malawer/.

30.     Strah and Rich reported to Anthony Zanolla.

31.     Strah's title was Vice President – Research Analyst and Portfolio Manager. His compensation package was a salary of $175,000 with a discretionary bonus capped at 40% of his salary.

32.     Prior to Strah accepting the position, Zanolla told Strah that in about one year Strah and Rich would replace Zanolla and co-manage the cat bond portfolios so that Zanolla could focus on other funds.

---

https://www.franklintempleton.co.uk/our-funds/capabilities/alternatives/specialist-managers/absolute-return-portfolio-management.

**3.    On May 31, 2022, Strah's Manager Changed From Zanolla To Michael Rich.**

33.    On May 31, 2022, Strah's manager changed from Zanolla to Michael Rich.

34.    Zanolla informed Strah that Rich would now be reporting into Lilly Knight and that Strah would now be reporting to Rich. Strah, however, was more qualified than Rich for the position.

35.    Effective January 1, 2023, Rich was promoted again, to Managing Director at K2 Advisors. Strah likewise was more qualified for this promotion.

36.    Rich was not competent for his position.

**4.    On June 16, 2023, Strah Discovered Rich's Fraud.**

37.    On June 16, 2023, Strah discovered Rich's fraud.

38.    While doing his typical end-of-week pricing uploads, Strah noticed that Rich placed an order for a bond that Strah knew earlier in the day had screened out of the funds' promised rules-based process. The rules-based process is based on thirteen factors. Earlier in the day when Strah had checked the bond the system indicated it should not be bought. Rich's order for the bond violated the process K2 Advisors had promised investors it would use. When Rich ordered the bond, the bond was what was classified as a "NO BUY."

39.    Strah then spent the weekend collecting data to determine what Rich had altered in the database to render this bond to appear to be a "BUY" when it was a "NO BUY".

40.    Strah discovered a clustering of fraud. Strah discovered a pattern of manipulated data spanning multiple bonds.

41.    Rich's fraud occurred when he was managing what was now called the Franklin K2 Cat Bond UCITS Fund (the "UCITS Fund") and the K2 Pyxis Fund. UCITS stands for

Undertakings for Collective Investment in Transferable Securities. UCITS "are a cornerstone of the European investment landscape. These funds provide investors with a diversified portfolio under strict regulatory oversight, making them appealing to both individual and institutional investors seeking cross-border opportunities in Europe." https://accountinginsights.org/what-are-ucits-and-how-do-they-work-in-investment-funds/UCITS. They "ensure transparency, liquidity, and investor protection, offering a structured framework for evaluating investment opportunities." Id.

42.     Rich's fraud occurred when cash was at an all-time high in the Franklin K2 Cat Bond UCITS Fund, due to Rich's ineptitude. In January 2023, the UCITS Fund had 32.37% in cash. Rich through what Strah believes was fraudulent trading, got cash down to 21.36% at the end of July 2023. For context, Strah ended February 2025 at 3.83% cash when he was managing the UCITS Fund, without engaging in fraud. Portfolio managers want to have less in cash because it mitigates cash drag.

### 5.     On June 20, 2023, Strah Reported Rich's Fraud To Risk Management.

43.     On June 20, 2023, Strah reported Rich's fraud to K2 Advisors's Operational Due Diligence & Risk Management team.

44.     After arriving into the office, Strah pulled aside Adrian Groves, a member of K2 Advisors's Operational Due Diligence & Risk Management team. Strah told Groves that he had "definitely discovered Mike Rich committing fraud week-over-week and in another case within days, by cross referencing Excel spreadsheets." For context, Strah used historical weekly screening Excel spreadsheets to illustrate Rich's fraud. Strah, for example, saved the Excel spreadsheet for June 20, 2023, when all the thirteen factors were correct. But then by June 22, 2023, Rich had

changed certain factors to falsify a "BUY" decision when it should have been a "NO BUY" decision. Rich had committed fraud. Groves expressed his concerns for the matter and notified his boss, Andy Kandiew, Head of K2 Advisors's Operational Due Diligence & Risk Management team.

45.     Shortly after, Strah met with Kandiew, who suggested that Strah document his findings and submit them to Lilly Knight, Mike Rich's manager. Kandiew offered to assist Strah by reviewing Strah's notes and providing comments on how to proceed.

46.     Strah later showed Groves his process and findings, which he believed to be indisputable evidence showcasing malfeasance via the manipulation of data to falsify a buy decision in the system.

47.     On June 22, 2023, at 4:49 p.m., Strah made a backup of the Access database. This database is the underlying input needed for the application of the rules-based process. It is a collection of at least ten years of cat bond data. Strah did the same on June 26, 2023, at 3:48 p.m. Strah did this to preserve evidence and in anticipation of further fraudulent manipulation by Rich.

48.     Strah memorialized his findings regarding Rich's fraud in what Strah refers to as his Cat Bond Findings Document.

### 6.     On July 5, 2023, Strah Sent Lilly Knight His Cat Bond Findings Document.

49.     On July 5, 2023, Strah sent Lilly Knight a copy of the K2 Pyxis Fund Investment Procedures—which Rich violated—and Strah's Cat Bond Findings document. This document explained how Strah had retrieved recoverable files which would distinguish the data Strah correctly input, compared to the changes that would occur after Rich used the file.

50.     For example, Strah delineated "Jordan Strah 6/20/2023 5:03PM correct data" versus "Mike Rich 6/22/2023 4:21PM incorrect".

51.     For convenience, Strah visually exhibited the changes next to one another in addition to the impact of how these changes falsified buy decisions.

52.     At this time, there were only two bonds included, Lower Ferry Re 2023-1 and Baldwin Re 2023-1, both being manipulated by Rich in a similar fashion and occurring in the same period.

53.     Strah's document also highlighted that Rich apparently accidentally changed the metric of another bond, Baldwin Re 2021-1, when trying to alter Baldwin Re 2023-1.

54.     Lastly, Strah would find another two fraudulent purchases, Res Re 2023-1 14 and Solomon Re 2023-1, both having similar manipulations performed to them when cross referencing their respective files.

55.     Additionally, Strah would discover that during this period Rich was overwriting formulas directly, compared to overriding risk metrics in the others. This is apparent when he attempted to purchase Mayflower Re 2023-1 B, which he hardcoded the formula to falsify a buy decision that he did not act on; referenced on the June 16, 2023 Excel file last modified by Rich. For completeness, this hardcoded number should not exist in this cell as everything is formulaic across these factors. Rich had removed the formula altogether and input the number to falsify a buy.

**7.    During The Week Of July 24, 2023, Robin Ostlund Instructed Strah To Correct Rich's Fraudulent Changes To The Database.**

56.    During the week of July 24, 2023, Robin Ostlund instructed Strah to correct Rich's fraudulent changes to the database. Effective April 22, 2024, K2 Advisors promoted Ostlund from "Deputy Chief Compliance Officer-K2" to "Chief Compliance Officer - K2."

57.    Ostland did not seem too concerned. She did not ask Strah if there were any additional errors he had uncovered, even though since his initial report Strah had found additional discrepancies and potential fraud that he had reported to senior compliance management.

58.    Around this time Strah notified Ostlund of additional database errors that he had discovered and showed her the database where Rich's name was logged next to the errors within the Risk Platform, RMS Miu.

59.    Within RMS Miu, Rich's username, mrich, was logged next to Lower Ferry 2023-1 B (June 9, 2023); Solomon Re 2023-1 (June 2, 2023); Res Re 2023-1 14 (April 21, 2023); and Baldwin Re 2023-1 (June 16, 2023). All of these resulted in a corresponding trade error report, due to Rich's malfeasance.

60.    Additionally, Rich's username was associated with Atlas Re DAC 2023-1 (May 5, 2023) and Mayflower Re 2023-1 B (June 16, 2023), both of which Strah flagged during his review covering this period.

61.    The process for trading in the funds at issue are that the investment professional looking to purchase what the rule-based system has given a "BUY" signal would within the RMS Miu system create a one-year risk run for that bond. The RMS Miu system highlights Rich's fraud because the runs Rich did were for "NO BUYS" whereas the runs Strah did were for "BUYS."

62.     Notably, as stated above, Strah, as Franklin Templeton knows, worked at RMS, specifically on the RMS Miu side of business and installed this environment sometime back in 2019/2020 for K2 Advisors. Strah knows the system inside and out and was shocked that Franklin Templeton was not deeply concerned by Rich's operations and did not perform a deeper review. Strah's impression was that even after Strah notified Franklin Templeton's compliance team of Rich's fraud, the compliance department did not document the fraud.

63.     As a recourse, Strah created an Excel file, to preserve date timestamped information, and used basic highlighting to identify errors he found. This is because overwriting in an Access database would have no tracking and conceal Rich's fraud. Strah was very concerned that Franklin Templeton was failing to conduct a proper investigation after his initial report of Rich's fraud.

64.     Additionally, Strah saved backups of the rules-based process, which contains date-timestamped information.

**8.      On July 25, 2023, Jordan Strah Discovered Additional Errors—Instances Of Rich's Fraud.**

65.     On July 25, 2023, Jordan Strah discovered additional errors—instances of Rich's fraud. Strah informed Ostlund of these additional errors.

66.     On August 3, 2023, at 10 a.m., Strah met with Rob Christian, Chief Investment Officer of K2 Advisors, and Lilly Knight, Rich's manager and Head of Investment Management at K2 Advisors. The meeting was in Christian's office.

67.     By now Strah had unequivocally demonstrated Rich's fraud on Franklin Templeton's investors.

68.     Strah during this meeting notified Christian and Knight that he had found additional discrepancies that they should investigate. Christian and Knight, however, dismissed Strah's additional discovery and said that Franklin Templeton's compliance department had finished its review and determined that the four discrepancies that Strah initially reported could not definitively be ruled as fraud—that it was "inconclusive."

69.     Christian said: "if it walks like a duck, swims like a duck, and quacks like a duck, sometimes it's not a duck."

70.     Christian and Knight both expressed that they were not going to terminate Rich's employment.

71.     Before the meeting ended, Strah stated that he would not work with someone who commits fraud, referring to Rich. Knight then suggested that Strah resign.

72.     Strah was shocked that Knight would want Strah to resign. Strah had indisputably discovered that Rich was committing securities fraud. And it was clear he would likely continue to do so, especially in an environment where senior management and compliance people were protecting him from repercussion.

**9.     Rich's Intentional Actions Directly Violated Franklin Templeton's Stated Investment Objective, Defined In The Offering Memorandum And Prospectus For Franklin Templeton Alternative Funds.**

73.     Rich's intentional actions directly violated Franklin Templeton's stated "Investment Objective," defined in the Offering Memorandum and Prospectus for Franklin Templeton Alternative Funds.

74.    According to the Prospectus for Franklin Templeton Alternative Funds,[4] in the "Investment Objectives" section, p. 28, Franklin Templeton follows a "systematic, proprietary rules-based approach."

75.    According to these stated Investment Objectives:

> The Fund's investment objective is to seek to generate attractive risk-adjusted returns over time with limited correlation to other asset classes through investment in a portfolio of natural catastrophe bonds. The Investment Manager seeks to achieve the Fund's investment objective through a systematic, proprietary rules-based process. Return is sought from a managed composition of the portfolio based on a set of rules that narrows the universe of catastrophe bonds through a screening and scoring process.

Id.

76.    Rich's actions, however, were unequivocally discretionary actions, requiring intentional manipulation to generate buy signals on bonds that the "systematic, proprietary rules-based process" deemed should not be bought.

77.    Rich's actions also violated the Cat Bond Strategy monthly newsletter, which Franklin Templeton distributed internally and externally to investors and prospective investors.

**10.    In October 2023, Strah Was On Vacation For The Second Half Of The Month And He Worried That His Absence Would Promote Rich's Fraud.**

78.    In October 2023, Strah was on vacation for the second half of the month, and he worried that his absence would promote Rich's fraud.

---

[4]    Franklin Templeton displays this Prospectus on its website: https://www.franklintempleton.lu/download/en-lu/prospectus/3a08053c-82a1-4c71-8544-be3129147092/FTAF-prospectus-en.pdf

79.     Upon returning from vacation, Strah made a backup of the database to examine new bonds that had come to market during that time, expecting that if something were to occur again, it would likely happen when he was not around. Strah was correct—see below Section 13.

**11.     Effective January 1, 2024, Strah's Title Was Changed From Vice President – Research Analyst And Portfolio Manager V.P. To Senior Analyst, And His Salary Increased By $20,000 To $195,000, But He Was Still Bothered By Rich's Fraud And Franklin Templeton's Failure To Take Appropriate <u>Action—So Strah Continued His Complaint.</u>**

80.     Effective January 1, 2024, Strah's title was changed from Vice President – Research Analyst and Portfolio Manager to Senior Analyst, and his salary increased by $20,000 to $195,000, but he was still bothered by Rich's fraud and Franklin Templeton's failure to take appropriate action.

81.     On February 23, 2024, after a certain compliance training, Strah spoke with Thomas Merchant, executive vice president, general counsel and secretary for Franklin Resources, Inc. Merchant:

> [O]versees the Company's Legal and Compliance divisions, including the Legal, Regulatory Compliance, Investment Compliance, and Internal Audit departments. In addition, he is a member of Franklin Resources' executive committee, a small group of the company's top leaders responsible for shaping the firm's overall strategy.

franklintempleton.com/profiles/thomas-merchant.

82.     Strah's phone call with Merchant was about 24 minutes. Strah had contacted Merchant because he knew Rich had committed fraud and reasonably believed Rich was likely continuing his fraudulent activity.

83.     Strah explained to Merchant the rules-based process and what had happened throughout June and July of 2023.

15

84. Strah expressed to Merchant that because what Strah had discovered was such brazen activity, spanning multiple factors, he was concerned that before this brazen activity, Rich had engaged in less obvious fraud.

85. Strah told Merchant he was worried about being professionally negatively affected because he feared retaliation for resurfacing a fraud case that was somehow deemed "inconclusive." Merchant told Strah that Strah was now a "whistleblower" and protected by bringing this to his attention.

86. Merchant told Strah he would investigate the matter. Strah, however, was subsequently never notified of an investigation being launched.

**12.   On About March 11, 2024, Having Not Heard From Merchant, Strah Initiated Further Contact With Merchant.**

87. On about March 11, 2024, having not heard from Merchant, Strah initiated further contact with Merchant.

88. Strah was concerned that the particularities of the fraud may be difficult for someone to grasp given the asset class and rules-based approach. Strah had to train the K2 Advisors compliance team when they were supposed to investigate Strah's complaint regarding Rich in June 2023 so he thought he might have to do the same with Merchant.

89. Merchant concluded that the first investigation was properly handled. He told Strah that he had contacted the involved parties involved but Merchant was vague. Merchant also told Strah that the K2 Advisors compliance team was "good" and said "there was nothing outstanding."

**13.    On April 4, 2024, Strah Created An "Errors while on vacation.xlsx" Document.**

90.    On April 4, 2024, Strah created an "errors while on vacation.xlsx" document.

91.    As stated above, Strah had been in Europe throughout the second half of October 2023. Upon returning, Strah made a backup of the database to examine new bonds that had come to market during that time, expecting that if something were to occur again, it would likely happen when he was not around.

92.    Not to Strah's surprise, Strah found that Rich had indeed engaged in malfeasance during Strah's absence.

**14.    On April 5, 2024, Strah Spoke With Bjorn Davis, Chief Compliance Officer At K2 Advisors.**

93.    On April 5, 2024, Strah spoke with Bjorn Davis, Chief Compliance Officer at K2 Advisors.

94.    Strah alerted Davis that Rich's habits did not change since Strah's first report in June 2023.

95.    Davis said he would launch another investigation.

96.    On April 10, 2024, Davis emailed Strah, stating:

> Good afternoon Jordan –
>
> This note is to acknowledge our conversation on Friday April 5th in which you identified several instances of data inconsistencies contained in the Catastrophe Bond database. We appreciate you bringing this matter to our attention. We take these matters very seriously and, in accordance with our standard procedures, we are conducting a review into the issue you raised.
>
> During our call, you indicated that you sent a communication to Tom Merchant to discuss this matter. I have not yet spoken with Tom, but I

17

did let him know you and I spoke and that I would brief him upon his return from his APAC trip.

If you have any further information that might assist in our review, please feel free to share it with us. We will come back to you if we have any questions.

Thank you,

Bjorn

97.    Additionally, on this date Ostlund and Davis put a live compliance monitoring in place.

**15.    On April 12, 2024, Ostlund Showed Strah An eDiscovery Tool That Should Have Been Provided To Him When He Initially Complained In June 2023, Or Used By K2 Advisors's Compliance Team Itself Back Then To <u>Investigate Rich's Clear Fraud.</u>**

98.    On April 12, 2024, Ostlund showed Strah an eDiscovery tool that should have been provided to him when he initially complained in June 2023, or used by K2 Advisors's compliance team itself back then to investigate Rich's clear fraud.

99.    This was an email / messenger surveillance tool so that Strah could search for files of particular interest, which Strah would later use to pinpoint supporting evidence of Rich's continued fraud that took place while Strah was on vacation.

**16.    On April 18, 2024, Strah In A Teams Chat Asked Merchant If Merchant Had A <u>"Forensic/Fraud Analyst" To Investigate Strah's Third Complaint.</u>**

100.    On April 18, 2024, Strah in a Teams chat asked Merchant if Merchant had a forensic/fraud analyst to investigate Strah's third whistleblower complaint.[5] Merchant replied,

---

[5]    Strah's first whistleblower complaint was made in June 2023. His second on February 23, 2024, directly to Merchant. This was his third.

"Not that I am aware of. Why do you ask?" To which Strah replied, "tomorrow we are set to validate the concern I raised with you a couple months back, about revisiting the initial case for other manipulated data and wanted to see if there are additional resources that Robin [Ostlund] and I could use." In the chat, Strah also wrote to Merchant: "I asked Robin [Ostlund] but she didn't seem sure - so wanted to check w/ you to see if you had resources that may differ from K2" and further explaining "essentially I'm looking for someone that is granted admin rights and server access, specifically for the K2 drive, as the machine stores information as events logs, eventids, timestamps, etc." These were read by Thomas Merchant, but he never replied.

101.    Additionally, Strah's conversation with Robin Ostlund, on Teams, included "this is what I went to Tom with the other month - thought there was a strong possibility that there had to be an initial testing of the manipulation before it clustered together over a span of a couple weeks". This comment referred to what Strah repeatedly stated since the first investigation over June to August 2023, which was accurate and validated during the next few weeks leading up to Mike Rich's termination of employment.

### 17.    On April 19, 2024, Strah And Ostlund Had A Cat Bond Verification Meeting, As Part Of The Investigation Of Strah's Third Complaint.

102.    On April 19, 2024, Strah and Ms. Ostlund had a Cat Bond Verification meeting, as part of the investigation of Strah's third complaint.

103.    These Cat Bond Verification meetings regarding Rich's fraud would continue until June 20, 2024.   On May 13, 2024, however, Franklin Templeton finally terminated Rich's employment due to the fraud that Strah had uncovered.

104.    Following Rich's termination of employment, Strah spoke with Ostlund.

19

105.    Ostlund asked Strah if Strah was "alright with Rob [Christian] and Lilly [Knight]." Ostlund said something to the effect that the compliance team was now able to do something about Rich's fraud, making it seem like the compliance team was not able to previously do something about his violations.

106.    On May 14, 2024, Rob Christian became Strah's manager.

107.    On June 11, 2024, Adam Petryk, Head of FTIS, pulled Strah aside, in Rich's former office, after speaking with Christian, to thank Strah for the good work Strah did to bring Rich's wrongful conduct to Franklin Templeton's attention.

**18.    On October 4, 2024, Christian Informed Strah That Knight—Who Had Previously Asked Strah To Resign When He Complained About Rich—Would Now Be His Direct Manager.**

108.    On October 4, 2024, Christian and Strah met and Christian informed Strah that Strah's operational title was being changed from Senior Analyst to Portfolio Manager.

109.    Christian also informed Strah that Knight—who had previously asked Strah to resign when he complained about Rich—would now be his direct manager.

110.    According to Christian, this decision was retroactive to October 1, 2024, to align with the integration of K2 Advisors into Franklin Templeton Investment Solutions ("FTIS").

111.    Strah asked Christian, who had been present at the meeting when Knight asked Strah to resign, to reconsider his decision to which he responded it was not his decision, but rather his boss, Wylie Tollette, had made this decision.

112.    After the meeting, Strah contacted Tollette's Executive Assistant, Karen Landi, via email at 2:07 p.m. to schedule a meeting to inquire why this decision had been made.

**19.    On October 21, 2024, Strah Met Via Teams With Tollete.**

113.    On October 21, 2024, Strah met via Teams with Tollette.

114.    The purpose of the meeting was for Strah to discuss with Tollette: 1) Strah having not yet been named to the Franklin K2 Cat Bond UCITS Fund despite being the person managing it since Rich's termination of employment; and 2) having Knight be Strah's direct manager despite her asking for his resignation for complaining about Rich's fraud.

115.    According to Tollette, Tollette had not made these decisions, but Christian had decided them. This contradicted what Christian had just told Strah.

116.    Strah explained to Tollette that it was very uncomfortable for him to be managed by Knight, given the history of Mike Rich and how Strah's complaint against him had been handled. Tollette told Strah he would change Strah's manager to someone other than Knight.

117.    Tollette told Strah that getting the operational title of Portfolio Manager was the first step in the process of being named to the fund, which would likely happen around April 2025.

118.    Strah requested a transfer to the New York City Office as he did not want to be at the Stamford Office given the people that Franklin Templeton somehow still employed.

**20.    On October 31, 2024, Knight Angrily Called Strah.**

119.    On October 31, 2024, Knight angrily called Strah. Knight scolded Strah for replying to Franklin Templeton's compliance team in Luxembourg. The Luxembourg compliance team had submitted certain questions earlier that week and one of the traders had passed those questions to Strah for response.

21

120.    Knight accused Strah of sneaking around. She said that Strah had Tollette change his manager, but that had not yet happened—Strah was still being managed by Knight. Knight also expressed annoyance that Strah had requested to be transferred to the New York City office.

121.    Knight still angry told Strah that she and Christian needed to focus on keeping the Luxembourg compliance team happy after all that had happened regarding Rich. According to Knight, Strah—the one who uncovered Rich's fraud—should have sent Knight the answers to the Luxembourg compliance team's questions. But Knight and Christian were in Strah's well-reasoned opinion responsible for covering up Rich's fraud and keeping him employed when he should have been fired after Strah's first whistleblower complaint. And Knight and Christian, Strah believes, kept Strah's initial whistleblower complaint and second complaint from the Luxembourg compliance team.

122.    Another reason that Strah and not Knight and Christian should have answered the Luxembourg compliance team's questions is that Knight and Christian do not have applicable experience in the catastrophe bond asset class.

**21.    On November 5, 2024, Artemis Published An Article That Strah Had "Become[] Cat Bond Fund PM At Franklin Templeton."**

123.    On November 5, 2024, Artemis published an article with the headline: "Jordan Strah becomes cat bond PM at Franklin Templeton." https://www.artemis.bm/news/jordan-strah-becomes-cat-bond-fund-pm-at-franklin-templeton/.

124.    Normally, when a person is managing a fund, like Strah was operationally doing, that person is officially named to the fund.

125.    Christian and Knight, however, were not letting Strah be named to the fund.

126. Upon the Artemis article being published, Christian emailed Denise Mann, Head Of Marketing, at Franklin Templeton Investment Solutions:

> Technically, the article is incorrect in that it is our intention to name Jordan PM to the fund at the next prospectus writing (April or May 2025). Today, he is technically not a named PM on the fund.

127. Mann then emailed Christian, stating:

> I see what you mean. I agree there is a distinction between the role/title of Portfolio Manager on the team and being a named Portfolio Manager via the Prospectus, and that Jordan falls into the former category for the time being. The way the article is written doesn't seem to make the distinction though, and Jordan's functional title is PM. Do you think we can leave the article as is or do we need to engage them?

128. The article is still there.

**22. On December 3, 2024, Vaneet Chadha Became Strah's New Manager.**

129. On December 3, 2024, Vaneet Chadha became Strah's new manager.

130. Chadha officially initiated Strah's request to transfer to Franklin Templeton's New York City Office, pending approval.

**23. Effective December 30, 2024, Strah's Base Salary Was Increased By $5,000.00 To $200,000.00.**

131. Effective December 30, 2024, Strah's base salary was increased by $5,000.00 to $200,000.00.

132. The $5,000 raise was inappropriate as Strah had been running the critical day-to-day and fundraising strategy of the Franklin K2 Cat Bond UCITS Fund by himself for approximately the last 7.5 months.

133.    Some notable achievements of Strah included: completing several audits; redrafting the Investment Procedures; presenting the fund across Europe, leading to an increase of millions of assets under management; and revamping the marketing decks.

134.    This raise was far below expectations given that Strah's workload had substantially increased over the past few months. Strah estimates that he worked 12-16 hours per day to accomplish all this on his own, only to have the further feeling of exclusion exacerbated by his reporting line changes.

135.    On January 6, 2025, Strah began working in the New York City office.

**24.    On January 27, 2025, Christian And Chadha Informed Strah That Strah Would Not Be Named To The Franklin K2 Cat Bond UCITS Fund For Which Strah Was The Operating Portfolio Manager—A Ludicrous Position That <u>Epitomizes Franklin Templeton's Unlawful Retaliation.</u>**

136.    On January 27, 2025, there was a Town Hall.

137.    After the Town Hall, Christian and Chadha informed Strah that Strah would not be named to the Franklin K2 Cat Bond UCITS Fund for which Strah was the operating Portfolio Manager—a ludicrous position that epitomizes Franklin Templeton's unlawful retaliation.

138.    When Christian and Chadha informed Strah that he would not be named to the Franklin K2 Cat Bond UCITS Fund, Strah was managing all aspects of the fund. Chadha acknowledged that Strah was the only person who knew and could handle all sides of the business, such as trading, presenting, handling investors' questions, pricing, and various other critical functions it takes to run a fund properly.

139.    Later that day Chadha claimed to Jordan during their weekly one on one meeting that Chadha had spoken with the outgoing Chief Investment Officer, Wylie Tollette, and that

24

Tollette had told Chadha that Adam Petryk, Head of FTIS, had decided to cancel Strah's application to be named to the fund he managed. The application was currently going through internal review; an approval would name Strah to the Franklin K2 Cat Bond UCITS Fund, that he ran, sometime around April 2025.

140. Chadha mentioned that Toilette was open to having a more thorough call on why this decision was made, which Strah initiated on Teams.

**25. On February 19, 2025, Strah Had A Teams Chat With Tollette.**

141. On February 19, 2025, Strah had a Teams chat with Tollette.

142. Tollette also reiterated to Strah that Adam Petryk had decided not to name Strah to the Franklin K2 Cat Bond UCITS Fund.

143. Strah felt specifically targeted given he was the only person at Franklin Templeton with any applicable knowledge of the asset class for the Franklin K2 Cat Bond UCITS Fund and because he was the operating portfolio manager of the fund.

144. Strah also had a different reporting line than all other Portfolio Managers, all of whom reporting directly into Christian, and did not have an associate to assist him in his day-to-day work like others had. For example, when Rich was managing the fund, he had Strah.

145. Rob Christian, Lilly Knight, and Vaneet Chadha were all named to the fund that Strah managed. Christian and Knight were intimately tied to the fraud Strah reported and covered up such fraud. And Chadha was now involved in the campaign to get rid of Strah.

146. The emotional toll on Strah due to Franklin Templeton's egregious unlawful actions had physical ramifications.

147.    On February 24, 2025, Strah went to the eye doctor for an annual eye examination. The veins in his eyes had curvature, which can happen with blunt force to the head or stress and high blood pressure. Strah had not sustained blunt force to his head. But he had been under prolonged stress due to Franklin Templeton's fraud, concealment of fraud, and retaliation against Strah for reporting the fraud. Strah had never been diagnosed with high blood pressure in the past but following this eye-appointment he had his blood pressure checked and on March 13, 2025, Strah learned he was now suffering from high blood pressure.

**26.    In Late February 2025, Chadha Issued Strah A Retaliatory And False Performance Review.**

148.    In late February 2025, Chadha issued Strah a retaliatory and false performance review, just like Rich had done in February 2024.

149.    Contrary to the false performance review, Strah's performance was stellar.

**27.    On March 1, 2025, Strah Complained To Franklin Templeton's Human Resources Department About What He Viewed To Be An Unlawfully Retaliatory Performance Review To Create A Pretext For Terminating His Employment.**

150.    On March 1, 2025, Strah complained to Franklin Templeton's human resources Department about what he viewed to be an unlawfully retaliatory performance review to create a pretext for terminating his employment.

151.    Nicole Tuorto was the human resources person who handled Strah's complaint.

152.    Strah, among other things, told Tuorto that he had effectively been demoted when Chadra became Strah's manager because now Strah was no longer reporting to the head, Christian.

Strah also pointed out to Tuorto that Strah was being characterized in the performance review as an "Analyst" despite him running every aspect of the fund.

153.    Strah complained to Tuorto that he had run and continued to run the fund for three years but was now having his role changed to a demoted analyst level, and Strah noted his prior whistleblowing.

154.    On March 17, 2025, Chadha admitted to Strah that the February performance review had been inaccurate, and he even apologized. Notwithstanding his apology, Chadha referred to Strah as "confrontational," which Strah understandably took to be a reference to Strah's whistleblowing.

155.    On March 19, 2025, Strah requested to reopen his human resources complaint case, which had been assigned number HRC01113494. The matter number assigned to Strah's request to reopen was HRC0114376. Ambar Pena was assigned to the matter, but neither Pena nor anyone else after contacted Strah about the matter.

156.    On March 25, 2025, Chadha conveyed the decision to terminate Strah's employment. Also present when this decision was conveyed was Tuorto. According to Chadha and Tuorto, Strah's employment was being terminated as part of a reduction in force. But this flies in the face of reason as Strah was the only person at Franklin Templeton who had been managing the Franklin K2 Cat Bond UCITS Fund. Strah was the only person with industry knowledge, systems access, and processes for running the fund, leaving only Rob Christian, Lilly Knight, and Vaneet Chadha to manage the fund and they were all woefully unqualified to do so.

27

**FIRST CLAIM**

**(Violation of the Sarbanes-Oxley Act, 18 U.S.C. § 1514A, et seq.)**

157.    Strah hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

158.    Strah engaged in multiple protected acts including complaints of fraud and financial impropriety at Franklin Templeton.

159.    Strah reasonably believed Franklin Templeton was violating federal law relating to fraud against shareholders, and a reasonable person in Strah's position would have believed the same.

160.    Defendants knew that Strah engaged in protected activities.

161.    Strah explained why he reasonably believed Franklin Templeton was engaging in fraud.

162.    Strah explained Franklin Templeton was violating the prospectus which provides material information to investors.

163.    By not following the prospectus, Franklin Templeton was lying to investors regarding the fund and its strategy.

164.    Additionally, Strah pointed to legal documents between investors and Franklin Templeton, explained Franklin Templeton was violating its own policies, and stated how this was fraud as Franklin Templeton was lying to investors of the fund by buying bonds with investor capital that should not have been purchased.

165.    The discretionary purchasing of bonds with investors' funds after promising investors a "rules-based" non-discretionary process is a flat out lie.

166.    Franklin Templeton was gaining new clients using the promise of this "rules-based" non-discretionary process.

167.    A reasonable person in Strah's position would reasonably believe that violating the prospectus, the offering memorandum, and the investment procedures of a fund violates securities statutes, regulations, and rules.

168.    Promising clients one thing and then doing another with their funds is fraudulent and misleading to investors.

169.    Strah's protected activities were followed by adverse actions against Strah, including, failing to name him to the fund he was managing, assigning him to work under a supervisor who had previously suggested he resign, issuing a pretextual performance evaluation, and terminating his employment for a pretextual reason.

170.    Strah's protected complaints were at the very least a contributing factor in Defendants' decision to take adverse action against Strah.

171.    As a direct and proximate result of Defendants' unlawful retaliatory conduct, Plaintiff has suffered, and continues to suffer, harm, including, but not limited to, lost wages, restricted future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

**SECOND CLAIM**

**(Violation of NYLL § 740)**

172.    Strah hereby repeats, reiterates, and re-alleges each and every allegation in each of the preceding paragraphs as if fully set forth herein.

29

173.    Strah disclosed to multiple supervisors activity, apparent policy, and practice that he reasonably believed was in violation of law, rules and regulations.

174.    Strah also objected to such activity, apparent policy and practice.

175.    As a result, Defendants took retaliatory action against Plaintiff.

176.    As a direct and proximate result of Defendants' unlawful retaliatory conduct, Strah has suffered, and continues to suffer, harm, including, but not limited to, lost wages, restricted future employment opportunities, humiliation, embarrassment, reputational harm, emotional and physical distress, mental anguish, and other economic damages and non-economic damages.

177.    Defendants' retaliatory action was willful, wanton, or malicious.

### **PRAYER FOR RELIEF**

WHEREFORE, Strah prays that this Court grant him judgment for:

1.    his actual damages in an amount to be determined at trial for loss of compensation and benefits, including an award of back pay, with interest, and an award of reinstatement with an attendant compensation increase or front pay in lieu of reinstatement including full fringe benefits and seniority rights;

2.    damages in an amount to be determined at trial to compensate Strah for mental anguish, humiliation, embarrassment, and emotional injury;

3.    compensation for reputational harm and other noneconomic damages;

4.    liquidated damages;

5.    punitive damages;

6.    an order enjoining Franklin Templeton from engaging in the wrongful practices alleged herein;

7.    reasonable costs, disbursements, and attorneys' fees;

8.    a civil penalty of an amount not to exceed ten thousand dollars; and

9.      such other relief as this Court may deem just and proper.

## **JURY DEMAND**

Strah hereby demands a trial by jury on all issues so triable.

Dated: April 26, 2026

Law Office of Andrea Paparella, PLLC

By:     /s/ Andrea Paparella
        Andrea Paparella
        134 W. 29th Street, Suite 1001
        New York, NY  10001-5304
        Telephone: (617) 680-2400
        Facsimile: (914) 462-3287
        Email: amp@andreapaparella.com